# GENERAL SESSIONS.

## NEW YORK, SEPTEMBER, 1823.

The People
vs.
Samuel B. H. Judah. } LIBEL.

*Hugh Maxwell*, District Attorney, and *William M. Price*, Counsel for the prosecution.

*Messrs. Bogardus, Van Wyck, Fay*, and *Scott*, Counsel for the prisoner.

Postponement of trial. See 1 Crim. Law Cas. 482.

The indictment in this case had been found in July term last, and the case was now moved for trial by the District Attorney.

Mr. Van Wyck of counsel for the defendant, moved for a further continuance of the case, in support of which he read affidavits stating that no information had been received from A. Burr, Esq., the counsel which had been employed by the defendant to prosecute his application to the supreme court for a certiorari, and that he had been guilty of no negligence in his efforts to procure the

decision of that court. Mr. Scott, on the same side, re-capitulated the facts set forth in the affidavits, and enforced the reasons that had been offered by his associate counsel. The public prosecutor waived a reply; and the Recorder, in pronouncing the unanimous opinion of the court, expressed very palpable and satisfactory reasons why the motion was refused.

N'W YORK,<br>Sept. 1823.<br><br>The People<br>v.<br>Judah.

Mr. Van Wyck then renewed his motion for a postponement of the trial, on the ground of the absence of five very material witnesses for the defendant. This motion was also grounded upon an affidavit of the defendant, averring that one of the witnesses, as he was informed and verily believed, was at Boston, one at Morristown, N. J., one (Dr. Francis) at Albany, and two others in different parts of this state. The motion was supported at considerable length by Messrs. Bogardus, Van Wyck, and Scott, in behalf of the defendant.

The court overruled the motion, and stated, that as process from this state cannot compel the attendance of persons in Boston or Morristown, the affidavit presented no sufficient ground for the continuance of the case, so far as related to those two witnesses. For witnesses in our own state fourteen days were allowed; and more than that length of time had been suffered to elapse since the decision of the supreme court in August, if any such decision had been made. The defendant had been indulged with as ample time as was allowed in civil cases, or even in cases of life and death. The court were, therefore, unanimous in refusing the motion, on the ground that the defendant had not used due diligence to procure his witnesses, if they were necessary for his defence.

1 Crim. Law<br>Cas. 72. See<br>also, p. 29, 30.

N'W YORK, Sept. 1823.

The People v. Judah:

The case of Mrs. Foot was adverted to by the court, as a much stronger one than the present, in which a similar motion had been denied.

Mr. Bogardus here abandoned the defence.

Mr. Van Wyck claimed to be informed who were the prosecutors in the action, and stated that Dr. Francis (as he was advised) had expressed an acknowledgment of satisfaction in the case, and that the other persons named in the indictment as persons libelled, did not solicit nor desire the prosecution of the defendant.

The court decided that, as it was a case in which the Attorney for the people prosecuted, it was not competent to inquire who might have solicited it, especially as it was not in the power of individuals to compromise or control it.

A jury was then empannelled and sworn, and the trial proceeded.

H. Maxwell, Esq., District Attorney, in opening the case to the jury, remarked, that it was an indictment for a libel, charging the defendant with the publication of a libellous book, entitled " Gotham and the Gothamites." In the performance of his public duty he had selected four libels which it contained, bearing upon different respectable individuals, who were grossly and wantonly aspersed by the author. It certainly was not necessary, nor did he conceive it to be proper, to swell the indictment to an unwieldy size, by including in it all the libels which that

volume contained. In the selection he had made, four instances had been taken of individuals of different professions, pursuits and circumstances in life, which would indicate the general and widely-extended malice of the author, against the most respectable men in our city. In the range of his rancour, it would be seen that mechanics, merchants, physicians, lawyers and divines were all included. Whether the book was published for the purpose of exciting public feeling, to fill his pockets, or gratify his malignity, would be left for the defendant to explain. Never had a publication been issued, within his knowledge, in this country, containing so many wicked, false and malicious libels as the present.—It had been inquired by the counsel for the defendant, who are the prosecutors? To this he could readily reply, that, as public prosecutor, he (Mr. M.) had taken up the book, and framed the charges, without consulting the individuals who were named in the indictment. There were many who would doubtless have come forward and made their complaint; but, standing in the relation which he did to the community, he had thought it most comported with the ends of public justice, to select the individuals as he did, from various professions and different ranks in life.

The two first counts in the indictment were for a libel, (the one for a printed, and the other for a manuscript one,) on General Jonas Mapes, of this city; a man whose character for industry and integrity was above reproach, and whose conduct as a military officer during the late war was unexceptionable. He was now moving in the ranks of private life, with a respectable family, and a property acquired by honest exertion. He had been

N'W YORK,
Sept. 1823.

The People
v.
Judah.

N'W YORK,  elevated to an honorable eminence by the confidence
Sept. 1823.  of the people, and whilst reposing in the shade of retired
The People  life was attacked in the most wanton and infamous man-
v.           ner by the defendant.  Mr. Maxwell had not, he said,
Judah.       deemed it necessary to go and inquire of such a man, will
you prosecute the libeller: had he done so, what would
have been the answer?  The veteran citizen would have
said no to the application ;—my life and my character, he
would have replied, are a shield against reproach.  It is
not necessary that I should step forth to defend them.
When their purity and integrity are assailed, there are
laws in the community to punish the assailant.  A public
prosecutor has been appointed for the very purpose of pro-
tecting the rights of the citizen; and courts of justice
have been instituted to inflict exemplary punishment for
their violation.  General Mapes is a mechanic; but it is
not mechanics alone that the defendant has attacked.
Even the ministers of our holy religion are not exempted
from the reach of his malice.

The third count in the indictment recites a libel upon
Professor Moore, of Columbia College; a man than whom
no one devotes himself more assiduously to the education
of youth, and the functions of his sacred duty.  He is a
gentleman who takes no part in the passing contentions of
the day.  He participates in none of the conflicts of party
politics or domestic strife ; and yet he is drawn from his
retirement, exposed to the vulgar gaze, and held up to the
public eye as an object of scorn and contumely.

The fourth and fifth counts in the indictment consist
of libels upon Samuel S. Gardiner, Esq., and Dr. John
W. Francis, of this city.  The former is a counsellor at

law, holding a respectable rank both at the bar and in society. He was a member of the last legislature, and possesses an irreproachable character. The latter is a physician, well known in this city, of high professional attainments, and of unblemished reputation.

Thus it will be seen, said Mr. M., that the defendant, if we prove him to have been the author of the book, has libelled all the professions in the community. It is but a small comparative number that the indictment embraces. There is scarcely any man of consideration in our city whose character, either public or private, has not been directly or indirectly attacked. Mr. Maxwell then read from the book entitled Gotham and the Gothamites, the passages laid in the indictment, and concluded by remarking that he had no wish to excite any sensibility in the minds of the jury, beyond that measure of honest indignation which every fair and honorable man must feel at the exhibition of such a wanton and scurrilous libel.

The witnesses were then called, and Mr. Z. Homans testified, that he purchased the book entitled Gotham and the Gothamites at the bookstore of Solomon King.

James Van Orden, the printer of the book, testified that the contract for printing it was made with Solomon King, and the copy furnished by him. He also identified four pieces of manuscript of the book, to which the testimony of subsequent witnesses relate.

Robert Maywood and Edward M. Murden, both testified their knowledge of the defendant's hand-writing, and

identified the pieces of manuscript referred to by Mr. Van Orden, as being in the hand-writing of the defendant.

Mr. Murden also proved the signature of the defendant to a bond of indemnity executed on the 2d of June, 1823, in which the defendant acknowledged himself to be the author of the book entitled Gotham and the Gothamites, and bound himself to save harmless the before-named Solomon King from any prosecution, costs, or damages, to which he might become subject by the publication of the same.

An anonymous letter was then offered in evidence by Mr. Maxwell, post-marked June 26th, and addressed to Dr. Townsend, of this city, stating in substance that a publication had just been issued from the press, containing a severe libel upon his (Dr. T.'s) character, and advising him to possess himself of the same, for the purpose of disproving the charges which the publication contained.

In this stage of the case a side-bar consultation was held between the defendant and his counsel, when Mr. Van Wyck stated to the court that the cause having been brought to trial at this term contrary to his expectation, so that the defendant was deprived of witnesses, who, if they could not relieve the case, might at any rate present circumstances of mitigation, the defendant, as advised by his counsel, had determined to make no further resistance to the prosecution. Mr. V. W. further stated, that the defendant, as he was advised, was only nineteen years of age : that he had perhaps been led on to this act of in-

discretion by the instrumentality of others ; and he hoped at all events, that the court in measuring out the punishment would confine its consideration to the cases laid in the indictment ; more especially as this prosecution could be no bar to future indictments at the instance of other individuals, and which the court would have no power to restrain or control.  He also expressed the hope and expectation, that the court would allow the defendant a reasonable time in which to lay the affidavits in support of the circumstances of mitigation to which he had alluded.

Mr. Maxwell observed, that he should expect the court to look at the whole book, and decide upon the case with reference to the whole subject matter.  This would be necessary, as in all other cases, for the purpose of determining the *quo animo* of the defendant.  He therefore gave this notice, that the defendant might prepare and offer his affidavits of mitigation, co-extensive with the whole book.

Mr. Price, of counsel for the prosecution, also referred to the case of Harry Croswell, who was indicted many years ago for a libel upon Thomas Jefferson.  He was the publisher of a newspaper called the Balance, and the court permitted newspapers published by the defendant, other than that containing the libel, to be given in evidence, for the purpose of showing the *quo animo* of the defendant.

Some colloquial discussions ensued, when the Recorder observed, that it was the defendant's right to submit affidavits to the court in mitigation of the punishment.

N'W YORK, Sept. 1823.

The People v. Judah.

1 Crim. Law Cas. 354.

So, also, it would be competent for the public prosecutor to offer affidavits in aggravation of the defendant's crime. The Recorder, then, in a brief but appropriate manner, charged the jury, that in cases of this sort, they were made, by the constitutional law of this state, judges both of the law and the fact. All that was left for the court to do, in the present case, was to state what, in their judgment, constituted a libel, and their opinion of the evidence adduced to prove it. They should not attempt—neither indeed was it in the power of the court, to control the verdict of the jury. There were two prominent questions which the jury were called upon to try : 1st. Whether the publication is in fact libellous; and 2dly. Whether, if it is so, the defendant is the author or publisher. A libel. was a writing, either printed or otherwise, which represented a man in a light to expose him to public ridicule or contempt. If this publication was of such a character, it would be, clearly libellous. The next question would be, whether the testimony was such as would warrant the jury in rendering a verdict against the defendant. On this point His Honor briefly adverted to, and recapitulated the testimony. He observed, that the liberty of the press was a right which should be sedulously guarded ; and in canvassing the pretensions of candidates to public office, and in examining their claims and qualifications for official trusts, much latitude should be allowed ; but if it should be permitted to invade the sanctity of private repose, and to draw into public discussion the merits or demerits of individual character, no person in the community could be safe. Our wives and our children might become subjects of public animadversion, and the greatest blessing of a free government be converted into its bitterest curse.

Such a state of things would be at war with that liberty of the press which every good citizen was bound to support and defend.

The jury retired, and in a few minutes returned into court with a verdict of *Guilty*.

The District Attorney then suggested to the court, whether it was not expedient and proper that the defendant should be taken into custody. It appearing that he was under a recognizance himself in the sum of $5000, and two sureties in the sum of $2000 each, the court held that the bonds were sufficient.

General Bogardus, of counsel for Judah, interposed an objection, on the ground that the averments relative to the identity of the persons said to have been libelled, had not been proved. J. M., he said, were the initials of many other persons in the city besides General Mapes. On the authority of the case of Van Vechten v. Hopkins, in Johnson's Reports, the court overruled the objection. The defendant then made a long address to the court; after which the Recorder proceeded to pass sentence, which, as he observed, the court was compelled to do, after a fair hearing by a jury of the country. There can be no doubt, said the Recorder, that you wrote the book. The handwriting of the original manuscript was clearly proved; independently of which, a bond of indemnity, under your own hand, was shown to have been executed by you, to save harmless Solomon King, the publisher, and in which you expressly avow yourself to have been the author of the work. The only remaining questions are, whether the publication be libellous or not; and if so, what shall be the measure of

N'W YORK,
Sept. 1823.

The People
v.
Judah.

punishment. The law has laid down a clear and certain rule for the definition of every offence for which a man can be ̄ arraigned. It is elucidated in such a way that it is scarcely possible for a man not to know whether he has committed a crime or not. The Almighty has likewise given us a moral sense to distinguish between right and wrong. The social relations—parental duty, and filial affection, for instance, are the spontaneous sentiments of our nature; and equally perceptible is the moral feeling that it is wrong to injure our fellow-man. But of all offences, those are the most strange in which the offender attempts to injure others without benefit to himself. Of this description is the libeller. The felon and the robber expect to enrich themselves by the spoils of their victim; but the defamer takes away from a man his reputation, without adding to his own. In the language of the poet—

> " Who steals my purse steals trash—*****
> But he who filches from me my good name,
> Robs me of that which not enriches him,
> And makes me poor indeed."

Most justly, therefore, does our law class libels with crimes. It is in vain to say that the liberty of the press is in danger by restraining its licentiousness. In its honest and proper use it is a blessing : its abuse is a curse. The line of distinction between them is as clearly drawn as in the use and abuse of the elements. The element of fire, for instance, is indispensable to the wants of man. It is a valuable agent for the preservation of health. It prepares his daily food—protects him from the vicissitudes of weather, and the inclemency of frost : these

are its legitimate uses. But is this an excuse for the in-
cendiary? Will this protect the wretch who sets fire to
his neighbor's house?. The author who writes with the
honest purpose of correcting the vices of the day, who
exposes iniquity and fraud—or who canvasses, with free-
dom and fairness, the pretensions of a man who aspires
to public trust and favor, should be viewed with a favorable
eye. Truth is useful to the public, when it relates to pub-
lic interests and objects; and if the views of the writer
are correct and honest, his efforts will be crowned with
the public approbation. But it is impossible that we
should authorize attacks on individuals, which are calcu-
lated, without doing any good whatever, to inflict pain
and distress. You say in your address to the court, that
your book is not libellous. Look to that portion of it con-
tained in the indictment.

The Recorder then read from the book those para-
graphs relating to General Mapes, Dr. Francis, S. S.
Gardiner, Esq., and Professor Moore. They are too
abusive in their character, and too disgraceful to the au-
thor, to justify a republication. In the course of his com-
ments upon them, the Recorder, with suitable reprobation,
pointed out their malignant character and injurious ten-
dency. He would appeal to any unbiassed and unsophis-
ticated mind, to say whether it was not an unkind and
unfeeling attack upon General Mapes: a man who had
been the builder of his own fortunes; a man of inoffen-
sive and unassuming manners, of integrity, respectability,
and worth. The libel ridiculed his profession, and held
him up to public scoff and ridicule. It was impossible
to excuse such conduct. Dr. Francis, also, a man emi-
nent in his profession, was derided and ridiculed. Among

other things he was scoffed at for wearing spectacles. This probably arose from a defect of vision; but suppose it did not—where is the advantage to the public that an individual should be lampooned on account of his dress? It was not to be endured. Such licentiousness would produce a shock and convulsion in society. The recesses of families would be broken into, and society unhinged. If the character of individuals is thus to be torn in pieces, the consequences would be, either open violence, or private assassination. Mr. Gardiner, who is next attacked, is a respectable member of the bar, and of the legislature. How has he deserved the abuse you have bestowed? If in these cases the reputation of those who were attacked have suffered no injury, it is owing to their weight of character, and the insufficiency of the libel to depress them. But continual droppings will wear the solid rock, and to perpetual attrition even adamant will yield.

But beyond these cases, you go to a man unconnected with the bustle of the world: to Professor Moore. He is a gentleman of great attainments in literature; one of the best Greek scholars in the country, and a valuable officer in our university. He mingles in none of our political strifes; possesses a pure moral character, and valuable reputation, and yet he is held up to ridicule!— he is described as "a fellow"—a sort of language which ordinary courtesy does not appropriate to gentlemen— represented as wanting ability, and in dress and appearance resembling an ourang-outang: this, too, in a paragraph in which you say he "has the ten commandments in his eye, for he seems determined to look nothing of heaven above, or of the earth beneath," is done by turn-

ing one of your own commandments, and of mine, into ridicule. And yet in your address to the court you have said the book is not libellous! Either you or the court and jury are mistaken. And have we been asleep, or could the jury, unless infatuated, say, without a palpable violation of their oaths, that it is other than a scandalous libel—a libel too of a very malignant character? To lash vice is justifiable; but this book is calculated to create breaches of the peace—to excite the angry passions—to embitter society, and to scatter its path with thorns. A more signal proof of this tendency cannot be furnished than by your own conduct. You have pressed it upon the court, that so great was the exasperation of the public mind you could not have a fair trial in this city. If what you said be true, of a great and respectable community, what must have been its moral sense of the cause that excited it? The court indeed believed that an impartial jury could be found; and has no doubt but you greatly overrate the effect of the publication upon the mass of the people. But your own showing tests the bearing of the libel upon the peace of society. In these remarks I confine myself to the parts of the book laid in the indictment. Hearing of the public proceedings to be had upon it, I have not read a syllable besides. But those passages, in the opinion of the court, contain as gross and palpable a libel as was ever framed by mortal man. You are a student at law: any book of jurisprudence you opened would show you it was so. You must have perfectly well known that it was a libel; and there is conclusive evidence that you did so regard it. Otherwise, why give King a promise of indemnity? The author of a praise-worthy volume would not dishonor himself by giving such a bond. Indemnity for what? Would

N'W YORK, Sept. 1823.

The People
v.
Judah.

N'W YORK,
Sept. 1823.

The People
v.
Judah.

the writer of " a moral, a virtuous, a religious work,"—
a treatise, for instance, on filial piety, think of giving
a bond of indemnity to the publisher ?   But this, conclu-
sive as it is, is not the only evidence of your conscious-
ness that the book was a libel.   After it was published,
you wrote an anonymous letter to an individual, in
which you told him he was terribly libelled in a book
called Gotham and the Gothamites, published by one
Solomon King, who was only *the dupe of " higher foes."*
Under these circumstances you stand, not only guilty of
writing the libels, but, according to your own view of
the subject, with a perfect conviction of their libellous
character.

Having thus stated what we think is the law as applied
to the case, it now becomes our duty to pronounce in what
way the offence shall be punished.   As the law formerly
stood, libels were punished by fine or imprisonment or
both, and a recognizance for future good behavior.   Under
that law Mr. Frothingham was imprisoned for a libel on
Gen. Hamilton, and Mr. Greenleaf was fined $700 for a
libel on Sir John Temple.   Our legislature, in its wis-
dom, by the 3d section of an act relative to libels, passed
in 1805, have restricted the power of courts, and declared
that they shall not imprison, in case of a libel for a term
exceeding eighteen months, nor impose a fine exceeding
five thousand dollars.   The court is unanimous in the
opinion, that under this act, they may fine or imprison, but
cannot do both ; nor is it perfectly clear that they have the
power to put the party under a recognizance.   As this is so,
whichever alternative we select, we think it should be se-
vere.   The public prosecutor has pressed upon us, no doubt
from the best and fairest motives, without any personal
hostility, but for the ends of public justice, that we should

imprison you.   And there are good reasons why we should do so.   You are a young man, and under age. If we fine you, the payment must come from some of your friends.   This would be punishing an innocent person for the offence of the guilty.   A punishment of that kind would be most likely to prevent a repetition of the crime.   There are difficulties either way.   If we imprison, some will think the term we assign too long; others, that it is too short.   Some will think we should imprison; others, that we should fine you; and of those who agree we should fine, some may think us unreasonably severe, and others unreasonably indulgent.   None have a right to censure the motives of our judgment, but it is the right of all to form their opinion.   It will be difficult to make either side sensible that we have taken the best course; but so long as the tribunals of justice make the public good their guide, they will be supported by general approbation, and by their own consciences.   There are reasons why we should impose a fine.   You have respectable connections, whose feelings are to be regarded, though they should not have a controlling influence. You are a young man coming into life : you have received from eminent men commendation of your talents; but you have shamefully abused those talents.   Imprisonment may sully your character and prospects.   Independent of that, Dr. Hammersley, a respectable physician, has sent us a certificate, stating that he has attended you for some years for a pulmonary affection of the chest, and that imprisonment might injure your health.   On the whole, the court have concluded to fine you, and the fine must be large—so large as perhaps may cause imprisonment.

N'W YORK,
Sept. 1823.

The People
v.
Judah.

N'W YORK,    The Recorder then sentenced the prisoner to pay a
Sept. 1823.  fine of four hundred dollars, and to stand committed until
The People   the judgment is complied with.
v.
. Judah.